# CIRCUIT COURT NO. 2 OF BALTIMORE CITY.

Filed April 14, 1897.

### GEORGE W. REID
### VS.
### H. EDGAR JOHNSON.

*James J. McNamara* and *Charles W. Jones* for plaintiff.

*Lewis Hochheimer* and *H. Edgar Johnson* for defendant.

STOCKBRIDGE, J.—

In December, 1890, Mr. William H. Reid died intestate, leaving considerable real and personal estate. His heirs-at-law and distributees were five children, four daughters and one son. The son, a painter by trade, was, as appears from the pleadings in this case and from the testimony, of intemperate habits, improvident, and as characterized by the answer and apparently borne out by the testimony, the black sheep of the family.

None of the children of Mr. Reid administered upon his estate, but all formally renounced, and requested that administration might be granted to Mr. H. Edgar Johnson, a member of the Bar of this city, and the defendant in this case. Administration accordingly was granted to him by the Orphans' Court of Baltimore City, and then so far as appears acting upon verbal authority from the various members of the family he undertook the supervision of the real estate belonging to Mr. Reid, collecting its rents, defraying its expenses and, so far as the said property was concerned, acting as the agent for the owners, and later was duly appointed the receiver for the property, the family concluding, upon his advice, to hold the entire real estate intact, instead of disposing of it by either sale or a partition.

Shortly after the death of Mr. W. H. Reid the son, George W. Reid, the plaintiff in this case, applied to Mr. Johnson for money, and although nothing at that time was legally demandable by the said George W. Reid, he did secure from Mr. Johnson, on the 14th of February, 1891, the sum of $300, less expenses, for which he gave a mortgage upon all his interest in the estate of his recently deceased father. This advance sufficed to meet the needs of the plaintiff for less than thirty days, and on the 6th of March another mortgage for the further advance of $500 was executed and placed on record, and still a third one for a further sum of $500, on the 23rd day of March. Then between that date and the 20th of October, 1891, there followed a rapid succession of mortgages, conditional deeds and absolute deeds, executed by Reid to Johnson, under which the interest of the plaintiff, sometimes in one and sometimes in another part of his father's estate, was either mortgaged to the defendant, conveyed to him conditionally with broad powers of attorney, or as in the case of the deeds executed on October 20th, the interests were absolutely conveyed. In connection with those various transactions, there were advanced to the plaintiff by the defendant at various times and in various amounts sums reaching in the aggregate $3,398.27.

The estimated value of the estate of William R. Reid, deceased, and upon which these various advances, amounting in the aggregate to the sum above named, were made, was $26,774, in which the interest of the plaintiff would have been $5,354.80, so that the amounts paid him for his interest, which interest was subject to an inchoate right of dower of his wife, from whom he was separated, amounted to a trifle above 63 per cent. of its then estimated value. This estimate, however, as shown by subsequent events, was too small, so that the actual interest of George W. Reid was approximately $500 more than the estimates made at the time of the final sale, and therefore the amounts paid him were slightly less than 60 per cent. of his real interest in the estate of his father.

In 1895 the bill in this case was filed, praying that the various conveyances be set aside and declared null and void, as having been fraudulently

obtained, and that, independent of any question of actual fraud, yet nevertheless by reason of the confidential relations of attorney and client which subsisted between the parties throughout the period when these various conveyances were made, there was a presumptive fraud, acting upon which a Court of Equity would set aside the conveyances.

There can be no question but what the relations existing between the parties from February to October, 1891, were either those of attorney and client, or agent and principal, or a commingling of the two, which amply justifies the invoking of the doctrine of confidential relations, whereby the onus of proof is shifted from the plaintiff to the defendant, and he is required to show affirmatively that no deception was practiced, no undue influence was used, and that all was fair, open, voluntary and well understood. The defendant has recognized this position, and has in his proof endeavored to meet it, and it is but proper to say, after a careful consideration of the whole testimony, that the Court finds no sufficient evidence of **any actual** fraud upon the part of the defendant, which would justify the maintaining of this action upon an allegation of fraud pure and simple.

In many States the doctrine with regard to confidential relations is less strictly adhered to than in the State of Maryland, and a number of adjudicated cases were cited in the argument, and still others could have been referred to, where Courts have held that in the absence of direct proof of fraud or undue influence, deeds from a principal to an agent, or from a client to an attorney, a ward to a guardian, have been upheld. In this State, however, where the relations of attorney and client subsist, the rule has been maintained with all its stringency. As was said in the case of Merryman vs. Euler, 59 Md. 591, "All the authorities concur that the highest degree of fairness and good faith is required from an attorney towards his client, and all their dealings will be closely scrutinized and no contract between them will be upheld where any undue consequences result to the attorney. * * * The attorney is supposed to have an ascendency over the client because of his relation to him and can easily impose on his credulity, *therefore transactions which would be open to no objection, where no such relations existed, will be held invalid as against a client. It is a rule of public policy.*"

The same doctrine has been adopted and fully sanctioned by the Supreme Court of the United States in the elaborately considered case, Michoud vs. Girod et al., 4 Howard 552, and is recognized as existing in the very recent case of Porter vs. Bergen, decided in the Court of Errors and Appeals of New Jersey, June 15, 1896; 34 Atlantic Reporter 1067.

See also LeGendre vs. Byrnes, 44 N. J., Eq., 376.

Cowee vs. Cornell, 75 N. Y. 91.

With this summary of the present condition of the law, what are the facts in this case? Within two months after the death of the plaintiff's father, he was making application to his father's administrator, who was also the legal adviser of the family, and of himself, as appears from the fees charged to and paid by him to the defendant, for money, and the moneys so applied for were paid along from time to time in varying amounts, and the mortgages, conditional deeds and absolute deeds and powers of attorney were given. Throughout this period, according to the plaintiff's testimony, he was indulging in constant debauches, and much, if not most of the time, under the influence of liquor, although he says that when he went to see Mr. Johnson he endeavored to "brace up" so that his condition would be the less apparent, and he might thus succeed in obtaining the money, and to obtain the money he would have signed and executed any papers which Mr. Johnson might have requested. The plaintiff's condition is also testified to by the witness Smith, while opposed to this is the testimony of the defendant himself, that, to the best of his apprehension, the plaintiff was not under the influence of liquor at the times when the various deeds or mortgages were executed, in which he is corroborated by the magistrate who took the acknowledgements. The defendant, however, is in no manner an expert on the subject of drunkenness, and that during this time the plaintiff was drinking, and on one occasion, at least, presented himself at the office of Mr. Johnson drunk is positively testified to by the

witness Stratton, the clerk at the time to the defendant.

There has been testimony introduced designed to show the value of the property at the time when these various conveyances were executed, and especially with the view of showing that the price paid by Mr. Johnson was as much, or more, than would have been paid by any one else under the circumstances; and if these various transactions had been between the plaintiff and some one not standing to him in the confidential relation of attorney and client, the Court would not have hesitated to uphold them. But that relation did exist; the condition of the plaintiff throughout the period of these various conveyances was such as to render him, even if entirely conscious of and understanding what he was doing, peculiarly amenable to the influence or requests of another; and when these facts are taken in connection with the estimated value of the plaintiff's interest in the estate, as valued by the defendant himself, and we find him paying to the plaintiff for it, sums amounting to only about 60 per cent. of that estimate, it becomes imperative upon the Court under the doctrine declared to be the law of this State to set aside each and all of the several deeds mentioned and referred to in this case between the parties, unless there has been such lapse of time between the execution of the deed and the institution of this suit for the purpose of setting them aside as would amount to laches. This has been strongly relied upon by the defendant,.for the purpose of defeating this action. It is true that equity will never lend its aid for the enforcement of stale claims, and the adjudicated cases abound in instances where the relief sought has been denied because of the laches of the plaintiff in the assertion of his right. Laches however, is a question which seems to be dependent in each case upon the particular facts and circumstances of such case, and a delay which under certain conditions would constitute laches, does not when those conditions have become altered. The common reason for the application of the doctrine of laches is where one of the parties to the original transaction has deceased, or proof of the facts involved in the dispute are lost, or not obtainable and in such cases and for the protection of the parties the doctrine of laches has been frequently invoked and applied by the Courts. In this case, however, there is a lapse of but four years from the time of the final deed to the institution of the proceedings to set them aside; no death has occurred, and the witnesses and documents requisite to the plaintiff for the presentation of his case have been readily obtained and fully presented to the Court. By reason of the relation of the parties their respective attitudes, though not so technically, closely approximate the relations which subsist between a trustee and his cestui que trust, and viewed in the light of the circumstances of this case, the Court does not feel that there has been such laches as to debar the plaintiff from now asserting his claim, and having the same fully passed upon.

Inasmuch, however, there is no evidence of actual fraud, the various deeds will only be set aside as deeds, or to speak more exactly will be deemed and construed as mortgages upon the property of the plaintiff to secure the payment of the various sums of money, with interest thereon, advanced by the defendant, and upon the payment of these various sums with interest, the plaintiff will be entitled to receive free and discharged from each and all the several deeds, mortgages and conveyances his undivided interest in the estate of his late father.

A decree will be signed in conformity with the foregoing views, referring the papers in the case to an auditor, that he may state an account as between the parties to the suit, with costs, to be paid by the plaintiff out of his interest in the property.